# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| AEROCARE MEDICAL TRANSPORT SYSTEM, INC. and CAROL HEISZ, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 3:20-cv-00179** |
| | ) | **Judge Aleta A. Trauger** |
| TRACTOR SUPPLY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM</u>

Plaintiff Carol Heisz[1] brings this case under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, seeking to recover expenses incurred in connection with air ambulance transportation services performed by AeroCare Medical Transport System, Inc. (AeroCare) on January 27, 2017, to fly her from Freeman Medical Center in Joplin, Missouri to Select Specialty Hospital in Madison, Wisconsin. (Complaint, Doc. No. 1.) Now before the court are cross Motions for Judgment on the Administrative Record filed by both Heisz (Doc. No. 55) and defendant Tractor Supply Company (TSC) (Doc. No. 56). For the reasons set forth herein, the court will grant the defendant's motion and deny the plaintiff's.

---

[1] According to a footnote to Heisz's Motion for Judgment on the Administrative Record, the parties have agreed that AeroCare Medical Transport System, Inc., nominally a plaintiff, is "asserting no claims separate and apart from the claims of plaintiff Carol Heisz, which claim [sic] it is asserting only as her authorized personal representative." (Doc. No. 55, at 1 n.1.)

## I.    REVIEW OF THE RECORD[2]

### A.    The Accident, Initial Treatment, and Transport

On December 30, 2016, Carol Heisz and her husband, Lee Heisz, who lived in Madison, Wisconsin, were in an automobile accident in Joplin, Missouri. (AR 144.) Lee Heisz was killed in the accident. (AR 144.) Carol Heisz suffered numerous serious injuries, including a spinal injury that caused permanent paralysis from the chest down. (AR 144, 35.) Carol Heisz (hereafter, "Heisz") was transported to the Freeman Medical Center in Joplin, Missouri for treatment. (AR 61.)

At the time of the accident, Heisz's husband was employed by defendant TSC, and both he and Heisz were covered by TSC's medical insurance plan (the Plan). The Plan was, at all relevant times, a self-funded health plan maintained by TSC and governed by ERISA. (AR 587.) TSC was and is the named plan administrator. (AR 5340.) BlueCross BlueShield of Tennessee, Inc. (BCBST) served as the Plan's third-party claims administrator.[3] (AR 478, 507.) BCBST contracted with BlueCross BlueShield of South Carolina (BCBSSC) (collectively with BCBST, BCBS) to serve as the primary provider of claims processing, customer service, and medical management. (AR 507.)

On the date of Heisz's admission to Freeman Medical Center, consulting physician Dr. Alan Buchele noted that she would be admitted for more than two days, that her "[d]isposition at

---

[2] All material facts herein are from the Administrative Record, which has been filed with the court at Docket Numbers 41, 42, 43, 45, 46, 47, 48, and 54-1. The order in which the eight parts of the Administrative Record (AR) were filed is not consecutive, but the court cites to the AR by the Bates number pagination assigned by the parties rather than by the pagination assigned by the court's electronic docketing system.

[3] BCBST was originally named as a defendant in this lawsuit, but the parties stipulated to the dismissal of all claims against it, under Rule 41(a)(2) of the Federal Rules of Civil Procedure, in June 2020. (Doc. No. 39.)

this time is uncertain," and that she would "likely" be discharged to a "rehabilitation facility closer to home." (AR 64.) The treatment notes from a "routine" psychiatric consultation on January 1, 2017, associated with Heisz's having suffered the death of her husband and paralysis in the accident, indicated that she was started on antidepressant medication, that she would "benefit from continued therapy," and that family members were present who would "assist with locating psychiatric and therapeutic resources in Wisconsin [where] the patient plans to return after discharge from hospital." (AR 69; *see also* AR 75 ("Discussed follow up plans with patient and family. Pt plans to return to Wisconsin.").)

On January 2, 2017, Heisz underwent fusion surgery on her spine, which was accompanied by numerous complications, including post-operative respiratory failure and acute blood loss secondary to a hemothorax. (AR (AR 76, 82, 84, 102.) As of January 4, 2017, she was improving, and the Freeman Medical Center anticipated transferring her to rehabilitation the following week. (AR 102.) However, her treatment notes indicate that she had a pulmonary angiogram and placement of an IVC filter on January 8, a bronchoscopy and mucous plug removal on January 13, and tracheostomy on January 16, 2017. (*See* AR 179, 146, 138.) As of that date, she was noted to have tolerated the procedure well and was "more stable than last week." (AR 138.) The plan was to discharge her to "Wisconsin rehab." (*Id.*)

Her discharge summary from Freeman Medical Center, dated January 24, 2017, briefly relates her course of treatment and complications over the preceding weeks and states that she had been "stable over this last week and has been moved out to the floor" from the ICU. (AR 162.) Without any further explanation, the summary notes: "She will be transferring by air due to her

multiple issues and complex hospital stay for her safety. She will need to go to select[4] for rehab and respiratory [treatment]." (*Id.*) The only other reference to her out-of-state residency appears under the heading "Discharge Diagnosis": "Social services is starting the discharge process she is from out of town." (AR 164.) Her "Condition on Discharge" was "Stable"; her "Discharge Disposition" was "Rehab Facility." (AR 166.) The summary concluded with "Special Physician Instructions" relating to activity, wound care, follow-up appointments to check the alignment and fusion of her spine, tracheostomy management, feeding tube management, and medications. (AR 166–67.) The patient was observed to be stable and to state that she was "feeling well and want[ed] to go home." (AR 167.)

The record does not suggest that Heisz's treating providers at Freeman Medical Center had any involvement in the selection of the rehabilitation facility to which Heisz would be admitted after discharge from Freeman Medical Center. Nor does the record reflect how or when exactly Heisz selected Select Specialty Hospital ("Select") in Madison, Wisconsin as the rehabilitation facility to which she desired admittance, but it apparently happened fairly early in the process. On January 6, 2017, Select[5] sought prior authorization from BCBS to provide rehabilitation services to Heisz following her discharge from Freeman Medical Center. (AR 31, 32.) Preauthorization was apparently granted, as this appeal does not concern coverage for Heisz's treatment at Select. In addition, Select also inquired about preauthorization for Heisz's transport to its facility. Case manager notes from BCBS indicate that "AFOWLER, RN" had "received a call from

---

[4] This reference to "select" presumably means Select Specialty Hospital, the rehabilitation facility in Wisconsin to which Heisz was transferred.

[5] The preauthorization request is actually from UWHealth Rehabilitation Hospital, but the defendant represents that these notes reflect that Select sought preauthorization. (Doc. No. 57, at 4.) It is not clear how UW Health Rehabilitation and Select are affiliated.

Sandy/LTAC[6] who wanted to send in clinicals. Informed Sandy that air transport will not be covered from Missouri to Wisconsin per the member's Group. She will let her facility know this. Will leave LTAC case open until I hear back from facility." (AR 30.) A note from the following day indicates that "Sandy/LTAC" had left a voicemail stating that she was "waiting to hear from auto insurance about payor for air transport from Missouri to Wisconsin." (*Id.*) On January 24, 2017, A. Fowler, RN entered a note stating: "PC to Sandy/LTAC requesting that she have transport company send in clinicals for transport authorization. Sandy stated that they will not send in because [Member's] family is to pay out of pocket. Informed her that denial cannot be sent to [Member] or provider if no request is sent in." (*Id.*)

The Administrative Record does not reflect that any additional effort was made, by AeroCare or Heisz's family, to obtain preauthorization for the air transport. Because no formal request for preauthorization was made, BCBS had no call to issue a pre-transport denial letter— or, for that matter, an approval. In any event, no such denial letter is in the record.

The record includes a "Physician/Provider Statement for Medical Necessity and Reasonableness for Air Medical Transport." (AR 148.) This form is not signed, and it is unclear who prepared it. It has a fax-stamp date on it of January 23, 2017 and was emailed to Ann Cashner, who is not identified in the record, by Rebecca Werth, who is identified elsewhere in the record as AeroCare's Vice President of Operations. (AR 495.) The form identifies the patient as Carol Heisz, the Requesting Facility and Requesting Physician as Freeman Hospital West and Brian Curtis, M.D., respectively, and the Accepting Facility as Select Specialty Hospital in Madison, Wisconsin. (AR 148.) Someone[7] wrote on the form, in support of the medical necessity of air transport,

---

[6] "LTAC" stands for long-term acute care.

[7] The plaintiff represents that "AeroCare submitted details regarding the medical necessity for the transport" "prior to initiating the transport." (Doc. No. 55, at 3.) TSC states that this

"patient's condition is too critical to allow for longer transport time by ground" due to "respiratory compromise, pulmonary embolism, cervical fractures." (*Id.*) In addition, the box is checked next to the line on the form stating "Patient requires specialty level of care that cannot be rendered at current facility," and a handwritten note explains: "patient requires specialty LTAC near residence/family." (*Id.*)

Heisz was transported by AeroCare from Joplin, Missouri to Madison, Wisconsin on January 26, 2017. (AR 214–21.) Under "Payment Information" on documentation of the transport, the notes reflect, in answer to the inquiry "Why Transport Called," "Medically Necessary Transport (Not Nearest Facility)." (AR 214.) There is no dispute that Heisz, at that time, remained in serious condition and that she received critical care and monitoring during the transport. (AR 216–21.)

The record includes a General Release and Consent dated January 26, 2017 and signed by Laura Wentz, Heisz's sister, on behalf of Heisz. According to this form, Wentz, "acting for and on behalf of the patient and accompanying passengers," consented to critical care transport by AeroCare, released AeroCare and its personnel from liability, agreed to "cooperate fully with [AeroCare] in their efforts to obtain payment for this transport," and also acknowledged personal liability for the charges associated with the transport. (AR 633.)[8]

### B.    Handling of the Claim

In early March 2017—approximately six weeks after it transported Heisz and two months

---

document "appears to have been submitted on [January 23, 2017] to a billing company, not to BCBSSC or anyone else acting on behalf of the Plan." (Doc. No. 57, at 4.) It asserts that this document was submitted to BCBS for the first time in September 2018 in connection with Heisz's administrative appeal. (*Id.*; *see* AR 209–42.)

[8] According to TSC, there is no evidence that this particular form was submitted to BCBS or anyone else acting on behalf of the Plan until sometime during the administrative appeal process.

after BCBS first discussed air transportation with someone at Select—AeroCare submitted a claim for payment of services to BCBS, seeking payment in the amount of $140,750. (AR 211.) On March 15, 2017, BCBS issued an Explanation of Benefits (EOB) to Heisz, stating that the entire amount of the claim was "not covered" and, therefore, that the patient was responsible for payment of the service. (AR 2.) The EOB stated, "We need the air transport records from the provider before we can review the service for benefits." (AR 4.)

At some point prior to June 8, 2017, AeroCare submitted a claim for coverage of the air transport services to American Family Mutual Insurance Company (AFMIC), which appears to have been Heisz's automobile insurance carrier. (AR 493–503.) AFMIC rejected the claim under Heisz's uninsured motorist coverage. AFMIC's notice of the denial states: "This bill will not be considered for payment under the Medical Expense Coverage per the request of our insured and/or [illegible] attorney or legal representative(s)." (AR 494.)[9]

It appears that, sometime in the fall of 2017, AeroCare requested that BCBS correct the EOB to reflect a new diagnosis and billed amount. (AR 9.) As a result, BCBS issued Heisz a revised EOB on December 18, 2017. (AR 18.) This amended EOB reflects that AeroCare's total charges were $158,550 and were still not covered.[10] In the "Remarks" section, the EOB explains that the patient's "benefit plan does not cover this service." (AR 20.)

AeroCare, on behalf of Heisz, appealed the denial of the claim for coverage of Heisz's air transport on February 24, 2018. (AR 15.)[11] The electronic claim note documenting the submission

---

[9] The defendant deduces from this explanation that Heisz must not have wanted AeroCare's claim to "count against any capped coverage for medical pay or 'med pay' coverage, which she might use to cover other medical expenses related to her accident." (Doc. No. 57, at 6 n.1.)

[10] It also showed that BCBS had provided coverage for services to Heisz related to the vehicular accident totaling $354,053.35 during the 2017 benefit period. (AR 18.)

[11] For reasons that are unclear, the fact that this appeal was submitted is substantiated in BCBS's electronic claim notes, rather than in a formal letter or notice from AeroCare. (AR 15.)

of the appeal states, under "Claim Appeal Request Details": "Please review provider appeal for denied charges." (AR 15.) The "Claim Appeal Response Details" states, "Appeal Denied," and explains: "based on the records available, the service is not covered by the member's plan of benefits since the patient was not transported to the nearest facility." (AR 15.)

To reach that conclusion, BCBS referred the appeal on March 8, 2018 to Medical Review Institute of America, LLC (MRIoA), an independent review organization that conducted a "specialty matched" review. (AR 589–601, 29.) The physician reviewer, Dr. Akhil Chhatre, listed his qualifications as including certification by the American Board of Physical Medicine & Rehabilitation in General Physical Medicine & Rehabilitation, completion of a fellowship in Interventional Spine, Sports, and Musculoskeletal Medicine, and membership in the American Academy of Physical Medicine and Rehabilitation, the International Spine Intervention Society, and the North American Spine Society. (AR 600.) Based on his review of the available documentation, Dr. Chhatre concluded that air transportation was required, because the appropriate level of services were not available at the hospital of initial care (specifically, "the first hospital did not have acute inpatient rehabilitation, which was what was required"), but that the transportation was not to the "nearest facility that was able to provide the appropriate level of services required for the member to progress" and, instead, was "primarily to repatriate the member to their community." (AR 598, 599.) Dr. Chhatre also observed that "there are several inpatient rehabilitation facilities which are closer." (AR 599.)

Dr. Chhatre's March 9, 2018 report was sent to the Plan's Medical Director for review on March 12, 2018. (AR 29.) On March 14, 2018, Michael Lawhead, M.D., on behalf of the Plan,

---

TSC surmises that the appeal "may have been electronic or otherwise informal." (Doc. No. 57, at 6.)

concurred. (AR 29.) BCBS issued Heisz a denial letter on April 12, 2018. (AR 631.) The letter notified Heisz that BCBS, in reviewing the claim, had reviewed the first level appeal correspondence, the records related to her care and medical treatment from AeroCare, and the opinions of Dr. Lawhead and the "specialty matched independent external review consultant" (Chhatre) and concluded that the air transportation services were not covered because the transport "was not to the nearest facility that was able to provide the level of service required for the member." (AR 631.) The letter also notified Heisz of her right to appeal the decision. (AR 631.)

Following the denial of AeroCare's provider appeal, AeroCare and Heisz retained Lien Resolution Partners (LRP), a "commercial payor dispute resolution" company based in Louisville, Kentucky. (AR 129–30.) On June 4, Jason Cooper, on behalf of LRP, sent a letter to BCBS's "Claims Review/Appeals Coordinator" asserting that the air transport was medically necessary and demanding that the claim "be processed properly in accordance with Mrs. Heisz's benefit plan within 30 days." (AR 130.) The letter also requested that BCBS make available to it a "complete copy of the administrative records" pertinent to the claim, as well as copies of the Summary Plan Description and Master Plan Document. (AR 130.)[12] Attached to Cooper's letter were an authorization to release protected health information to third parties and designation of Cooper and Matthew Williams as Heisz's authorized representatives for purposes of her appeal, signed by Heisz (AR 131–33), and an opinion letter from "B. Klein, M.D.," dated May 25, 2018.

Dr. B. Klein, whose qualifications are not identified in the letter, opined in relevant part as follows:

> Following surgical and medical stabilization, it was apparent Mrs. Heisz had reached <u>maximum medical benefit at Freeman Medical Center</u>. She required care at a facility capable of providing the necessary ongoing acute care, spinal care,

---

[12] The letter indicated that this was the third request for administrative record and plan documents, but the record does not appear to contain any earlier such requests.

pulmonary care and long-term rehabilitation which was not available at Freeman Medical Center. . . . [T]he decision was made to transfer Ms. Heisz to Select Specialty Hospital in Madison Wisconsin for higher level of care.

The standard of care for this patient dictates medical, surgical and neurologic stabilization for transport and then transfer of patient to a facility where acute medical, neurologic, spinal, psychosocial and long-term rehabilitation needs could be met. This is precisely what happened in this instance. In this unfortunate situation, the emotional impact of losing your spouse, use of leg and bowel and bladder function cannot be underestimated. Her best chance of survival and optimal clinical outcome required the emotional and family support available at Select Specialty Hospital. . . .

Moreover, the transfer decision was not made in isolation and without a valid medical basis to request the transfer. In fact, the treating teams included neurosurgery, pulmonary, internal medicine, psychiatry and social services. Consequently, the treating teams were able to make an informed and educated decision and a decision in accordance with the standard of care required for this patient. The decision to move Mrs. Heisz to Select Specialty Hospital for care was obviously the correct and only decision. It would be absurd and inhumane to transfer this patient to a location other than Select Specialty Hospital near her home which was capable of providing the necessary specialty services contemporaneous with the psycho-social support system and family involvement.

. . . . [Ms. Heisz's] condition as well as the distance to Select Specialty Hospital necessitated rapid transport and medical interventions which could only be provided via fixed-wing aircraft with the appropriate medical staff and equipment.

In view of the above facts and circumstances, it is my medical opinion that an upgraded level of care via fixed-wing transport to Select Specialty Hospital in Wisconsin was medically necessary for this patient.

(AR 135–36 (emphasis in original).)

Following receipt of the appeal documentation submitted by LRP, BCBS issued a denial letter to Heisz on August 13, 2018, in which it appeared to treat the appeal as a first-level appeal. (AR 200–01.) The basis for denial, confusingly, was that the "member was electively transported home to received [sic] services when available at the sending institution." (AR 200.) This was the rationale for the original denial determination, made by Dr. Koren in March 2017, and the rationale expressly rejected by Dr. Chhatre in the first appeal, when additional documentation had been made available. (*Compare* AR 248 ("PER REVIEW BY DR. KOREN: This is not a covered

service. The member was electively transported home to receive services available at the sending institution. This benefit plan has a specific exclusion. . . paula porter, rn 03/28/17.") *with* AR 631 (April 12, 2018 BCBS initial appeal denial letter, notifying the plaintiff that Dr. Lawhead and the "specialty matched independent external review consultant" (Dr. Chhatre) had concluded that air transportation services were not covered because the transport "was not to the nearest facility that was able to provide the level of service required for the member").)

On September 10, 2018, LRP submitted a final, "second-level" appeal on behalf of AeroCare and Heisz. (AR 204.) It resubmitted the same attachments included with its initial appeal letter as well as a "Revised Opinion Letter" from B. Klein, M.D., dated August 29, 2018. (AR 204–08.)

Thereafter, Jason Cooper with LRP became (understandably) frustrated with BCBS's handling of the third appeal and, in November 2018, contacted TSC directly. (*See* AR 623–25 (detailing chronology of contacts with BCBS between September 10, 2018 and November 6, 2018).) His concerns were referred to Melissa Williamson, TSC's Vice President of Total Reward, the company's employee benefits division. (*See* Doc. No. 57, at 8.) Cooper and Williamson engaged in a series of emails between November 14 and December 6, 2018 (AR 602–23), through which Williamson confirmed that AeroCare had not obtained preauthorization for air transport services as required by the Plan. (AR 603.)

On February 5, 2019, Williamson sent a letter to Jason Cooper at LRP in response to his "query regarding Carol Heisz' appeal for benefits." (AR 635.) Williamson stated that, after reviewing the information submitted to TSC by both LRP and BCBS, TSC had confirmed that the "denial of Ms. Heisz' appeals is consistent with the terms of the Plan." (AR 635.) More specifically, Williamson noted that the Plan required preauthorization for a member's transport

from one hospital to another using air ambulance and that preauthorization would be granted only upon a showing that certain requirements were met, including, among others, that "the second hospital must be the 'nearest medically appropriate facility' to treat [the member's] illness or injury." (AR 635.) She concluded: "[a]s BCBS communicated to Ms. Heisz in her claim and appeal denials, the facility to which Ms. Heisz was transferred in Madison, Wisconsin was not the nearest medically appropriate facility to the hospital in Joplin, Missouri from which she was transferred." (AR 635.)

On February 20, 2019, Regginald Brown, as a Medical Records & Appeals Supervisor for BCBSSC, emailed the members of the BCBS Claims Review Committee about Carol Heisz's appeal. (AR 383.). The members of the committee voted to uphold the denial of the claim on the basis that, as one committee member stated, "medical director states member was flown to repatriate to her community versus flown to the nearest facility that could provide services." (AR 383; *see also* AR 385–95 (other members concurring in denial).)

Thereafter, BCBS sent Heisz two different letters—the first dated March 5, 2019 and the second dated April 8, 2019—giving her notice that the "Appeals Review Committee" had met to review her claim and concurred in the denial of coverage. (AR 396, 398.) The language of the two letters differs slightly, as the first indicates that coverage was denied because "Your benefit plan does not cover this service. Please refer to the Exclusions Section of your benefit booklet for specific details." (AR 396.) The second letter states that the denial of coverage was upheld because the services were deemed not to be medically necessary and therefore not covered. (AR 398.)

### C.    Relevant Plan Language

The Schedule of Benefits for the 2017 Plan year expressly provides that the benefits it describes "are subject to all terms and conditions of the Plan of Benefits," but, "[i]n the event of a conflict between the Plan of Benefits and this Schedule of Benefits, the Schedule of Benefits shall

control." (AR 404.) The Preferred Provider Plan of Benefits (Plan) itself reiterates that the "payment of Covered Expenses is subject to all terms and conditions of the Plan of Benefits and Schedule of Benefits," and that, if there is a conflict between them, the "Schedule of Benefits controls." (AR 436.)

The Plan states that "Covered Expenses will only be paid for Benefits . . . [f]or which the required Preadmission Review, Emergency Admission Review, Preauthorization and/or Continued Stay Review has been requested and Preauthorization was received from the Corporation (the Member should refer to the Schedule of Benefits for services that require Preauthorization)," "[t]hat are Medically Necessary"; and "[t]hat are not subject to an exclusion" under the Plan. (AR 436.)

The Plan defines the term "Covered Expenses" as

the amount payable by the Employer's Group Health Plan for Benefits. The amount of Covered Expenses payable for Benefits is determined as set forth in this Plan of Benefits and at the percentages set forth on the Schedule of Benefits. Covered Expenses are subject to the limitations and requirements set forth in the Plan of Benefits and on the Schedule of Benefits.

(AR 424.)

It defines "Medically Necessary/Medical Necessity" as:

health care services that a Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

1. In accordance with generally accepted standards of medical or behavioral health practice;

2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease;

3. Not primarily for the convenience of the patient, patient's caregiver(s) or Provider; and,

4. Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

All requirements of the above-referenced definition must be met in order for a health care service to be deemed Medically Necessary. The failure of a health care service to meet any one of the above referenced requirements means, in the discretion of [BCBST], the health care service does not meet the definition of Medically Necessary/Medical Necessity.

(AR 429.) Under this definition, "for the purposes of determining Medically Necessary/Medical Necessity," the BCBS is granted "the discretion to utilize and rely upon any medical . . . standards, policies, guidelines, criteria, protocols, manuals, publications, studies or literature (herein collectively referred to as "criteria"), whether developed by [it] or others, which in [its] discretion are determined to be generally accepted by the medical . . . community" (AR 429.)

"Preauthorized/Preauthorization" is defined as "the approval of Benefits based on Medical Necessity prior to the rendering of such Benefits to a Member." (AR 431.) While preauthorization establishes the medical necessity of a requested benefit, it "is not a guarantee of payment or a verification that Benefits will be paid," as payment remains subject to "all other limitations and exclusions contained in this Plan of Benefits." (AR 431.)

Regarding preauthorization, the Schedule of Benefits states that "[a]ll admissions require Preauthorization" and that, if preauthorization is not obtained, "financial penalties may be assessed." (AR 405.) Otherwise, the Schedule of Benefits identifies a few discrete outpatient benefits for which preauthorization is required, including MRIs, CAT and PET scans, and Home Health Care, among a handful of other services. (AR 405.) The Schedule of Benefits identifies "Ambulance service (including air ambulance)" as a covered service, for which the "Employer pays 80% of the Allowable Charge after the Benefit Year Deductible," and the member pays either the remaining balance or the remaining 20% of the allowable charge, depending upon whether the provider is a "Participating Provider" or a "Non-Participating Provider." (AR 411.) The Schedule

of Benefits does not expressly identify ambulance transport as a service for which preauthorization is required—but it also does not state that preauthorization is *not* required.

The "Benefits" section of the Plan explains that "[a]ll admissions and some Benefits (*as indicated herein or on the Schedule of Benefits*) require Preauthorization to determine the Medical Necessity of such Admission or Benefit." (AR 436 (emphasis added).) Under the description of coverage for "Ambulance Services," the Plan states:

> The following requirements apply to all ground and air ambulance services and transports:
>
> 1. The transport is Preauthorized as Medically Necessary and reasonable under the circumstances;
>
> 2. A Member is transported;
>
> 3. The destination is local within the United States; and,
>
> 4. The facility is medically appropriate to treat the Member's condition.

(AR 438.) In addition, if a patient seeks to be transferred as an inpatient from one hospital to another facility using an air ambulance, she must show that:

> 1. The first Hospital does not have the needed Hospital or skilled nursing care to treat the Member's illness or injury (such as burn care, cardiac care, trauma care, and critical care);
>
> 2. The second Hospital is the nearest medically appropriate facility to treat the Member's illness or injury;
>
> 3. A ground ambulance transport would endanger the Member's medical condition; and,
>
> 4. The transport is not related to a hospitalization outside the United States.

(AR 438.)

"Repatriation" is expressly "excluded and is not a Benefit for which Covered Expenses are payable." (AR 438; *see also* AR 449, 455.) However, the Plan defines repatriation as "[s]ervices and supplies received as a result of transporting a Member, regardless of cause, from a *foreign*

*country* to the Member's residence in the United States." (AR 455 (emphasis added).)

## II.    PROCEDURAL HISTORY

The plaintiff filed her Complaint initiating this action on February 28, 2020, under 29 U.S.C. § 1132(a)(1)(B), seeking to recover the cost of the air transportation from Joplin, Missouri to Madison, Wisconsin provided by AeroCare on January 26, 2017. She also seeks attorney's fees and costs under 29 U.S.C. § 1132(g)(1). (Doc. No. 1, at 9–10.) The parties filed their dueling Motions for Judgment on the Administrative Record on December 2, 2020. (Doc. Nos. 55, 56.) Each filed a Response to the other's Motion (Doc. Nos. 58, 59), and TSC filed a Reply in further support of its own Motion (Doc. No. 60.)

## III.   STANDARD OF REVIEW

Section 1132(a)(1)(B) states that a plan participant or beneficiary may bring a civil cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights under the terms of the plan." Judicial review of the denial of benefits under § 1132(a)(1)(B) is *de novo* unless the ERISA plan at issue gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the language of the plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, then the determination is reviewed under the extremely deferential "arbitrary and capricious" standard. *Id.*; *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013). The plan administrator bears the burden of proving that the arbitrary and capricious standard applies, that is, that the plan provides it discretion to construe and interpret the plan. *Brooking v. Hartford Life & Acc. Ins. Co.*, 167 F. App'x 544, 547 (6th Cir. 2006); *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002). Here, the plaintiff expressly concedes that the Plan contains a clear grant of discretion to the administrator to determine benefits and construe the Plan

and that the court's review is under the arbitrary and capricious standard. (*See* Doc. No. 55, at 9.)

The arbitrary and capricious standard of review is "the least demanding form of judicial review of administrative action." *Johnston v. Dow Employees' Pension Plan*, 703 F. App'x 397, 401 (6th Cir. 2017) (quoting *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011)). As the Sixth Circuit has repeatedly recognized, the level of deference accorded by the standard is "extreme": "Indeed, for '[a]n extremely deferential review[] to be true to its purpose, [it] must actually honor an extreme level of deference to the administrative decision.'" *Id.* (quoting *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064–65 (6th Cir. 2014)). Under this standard, the challenged denial of benefits "must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Id.* That is, a decision cannot be deemed arbitrary or capricious if it is "'rational in light of the plan's provisions,' or when it is possible to 'offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Id.* (quoting *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)). The plaintiff "bears the burden of proving that the Plan Administrator's decision was arbitrary or capricious." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011).

## IV.     DISCUSSION

### A.     The Defendant's Motion for Judgment

The defendant argues that, under the arbitrary and capricious standard, the administrative decision to deny coverage of the plaintiff's air transportation should be upheld as reasonable, because: (1) the Plan required preauthorization, and the plaintiff did not even request, much less obtain, preauthorization of air transport; (2) the Plan reasonably determined that the primary purpose of the air transport was to return the plaintiff to her home and, as it was in this sense primarily for her or her caretakers' convenience, did not meet the Plan's definition of medical

necessity; (3) the Plan reasonably concluded that Select was not the nearest facility to Freeman Medical Center in Joplin, Missouri that could provide medically appropriate care; and (4) none of the plaintiff's treating physicians at Freeman Medical Center actually offered an opinion as to the necessity of transfer, and the Plan's reliance on its own reviewers—and independent reviewer's—determination over that of "B. Klein, M.D." was reasonable.

In response, the plaintiff argues that preauthorization was not required and that the defendant, in denying her claim, improperly "discount[ed] the independent report of Dr. Klein [and] the recommendation of Dr. Curtis," her "supervising physician" at Freeman Medical Center, regarding her "need for psychosocial support following the traumatic accident that paralyzed her and took the life of her husband." (Doc. No. 58, at 3, 4.) She also contends that the Plan had an obligation to identify a closer appropriate facility, which it still has not done. Finally, she contends that merely securing an independent reviewer's opinion does not assure that the defendant's denial was not arbitrary and capricious.

### 1. Preauthorization

BCBS never posited the lack of preauthorization as a basis for denying the plaintiff's claim for coverage of her air transport in the initial denial and intermediate appeals. Preauthorization was not raised as an impediment to coverage until Jason Cooper with LRP began communicating with Melissa Williamson at TSC. In her letter to Cooper dated February 5, 2019, Williamson noted that TSC had concluded that the denial of the claim was consistent with the Plan's requirements, both because no preauthorization had been obtained and the transferee hospital was not the "nearest medically appropriate facility." (AR 635.) But the final denial letters from the Plan indicated only that coverage was denied because the "benefit plan does not cover this service," referring the plaintiff to the "Exclusions Section of [her] benefit booklet" (AR 396), and because the services

were deemed not to be medically necessary and therefore not covered (AR 398). The Plan Administrator, that is, never relied on lack of preauthorization as a basis for denial of the claim.

ERISA requires that, when benefits under the statute are denied, the employee benefit plan must "provide adequate notice in writing" to the plan beneficiary, "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," and it must "afford" the beneficiary "a reasonable opportunity . . . for a full and fair review . . . of the decision denying the claim." 29 U.S.C. § 1133. Further, the "arbitrary and capricious" standard of judicial review presumes a review of the basis for the plan administrator's decision, as it requires consideration of whether the denial "results from a deliberate principled reasoning process and is supported by substantial evidence." *Johnston*, 703 F. App'x at 401. The Sixth Circuit has held that a plan administrator may not invoke a new basis for the denial of a claim in the course of judicial proceedings, at least where it expressly declined to rely on that basis during the administrative proceedings. *See Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 368–69 (6th Cir. 2009) (holding that the plan was "precluded from asserting a different basis for denial in the judicial proceedings" than the one it had relied on during the administrative proceedings (citing *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 828–29 (10th Cir. 2008)).

Waiver is defined as the "voluntary and intentional relinquishment or abandonment of a known existing right or privilege which, except for such waiver, would have been enjoyed." *Trane U.S. Inc. v. Neblett*, 291 F. Supp. 3d 848, 853 (M.D. Tenn. 2018) (Crenshaw, C.J.) (quoting *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647–49 (7th Cir. 1993), *abrogated on other grounds by Coker v. Trans World Airlines, Inc*., 165 F.3d 579, 585 (7th Cir. 1999)). In that sense, BCBS never actually waived its ability to rely on the lack of preauthorization as a basis for denying the

claim.[13] As a result, under other circumstances, the court would likely remand this case for further administrative proceedings, in order to allow the parties to properly address the issue of preauthorization in the administrative setting. Because, as set forth below, the record supports the denial of the claim on other grounds, the court declines to consider the issue of preauthorization, and remand is not required in this case.[14]

### 2. Medical Necessity and the Nearest Facility

Even assuming that BCBS and TSC waived reliance on preauthorization by not expressly relying on it to deny coverage, the decision was nonetheless supported by substantial evidence.

Under the Plan, air ambulance services are not covered unless the transport is "Medically Necessary and reasonable under the circumstances" and made to the "nearest medically appropriate facility." (AR 438.) To be medically necessary, a health care service must not be "primarily for the convenience of the patient, patient's caregiver(s) or Provider." (AR 429.) As set forth above, the plaintiff bears the burden of proving that the denial of benefits based on the determination that the transport was not to the nearest medically appropriate facility was arbitrary and capricious.

The defendant's reviewers, Dr. Lawhead at BCBS and Dr. Chhatre at MRIoA, concluded from their review of the record that the primary purpose of the plaintiff's air transport was to

---

[13] As Chief Judge Crenshaw of this court has observed, the Sixth Circuit has not ruled on the question of whether, and under what circumstances, a claim of waiver may be viable in the ERISA context, and other circuits are split on the issue. *Trane U.S.*, 291 F. Supp. 3d at 852 (citations omitted).

[14] The court nonetheless notes that the Schedule of Benefits and the Plan, construed harmoniously, unambiguously make it clear that (1) benefits for which preauthorization is sought but not obtained are not covered; (2) benefits identified in either the Schedule of Benefits or the Plan as requiring preauthorization require preauthorization; and (3) air ambulance services require preauthorization. The plaintiff neither sought nor obtained preauthorization, and the defendant could have legitimately based its denial of her claim on that failure.

"repatriate [her] to her community." (AR 29, 600.) TSC concurred in that decision. (AR 635.) While the Plan itself defines "repatriation" as returning to the United States from a foreign country, the Plan also provides that services provided primarily for the convenience of the beneficiary or her caregivers are not medically necessary. Together, these Plan provisions make it clear that air ambulance services are not covered when their primary purpose is to transport a person to her preferred location rather than to the nearest medically appropriate location. Dr. Chhatre specifically observed that Select was "not the closest acute inpatient rehabilitation facility to Joplin, Missouri." (AR 599), and BCBS and the Plan agreed. (AR 29.)

The plaintiff argues that these determinations were not supported by substantial evidence because they "discount" her treating physician's recommendation, referring to Dr. Curtis, the plaintiff's "supervising physician" in Joplin. The record, however, does not support a conclusion that Dr. Curtis or, indeed, any of the plaintiff's treating physicians at Freeman Medical Center reached a conclusion—or was ever asked to consider—whether transport to Madison, Wisconsin was medically required. Instead, as the defendant argues, the record makes it clear that the plaintiff and her family decided very early in the process that she should be transported to a facility closer to her home, and they apparently chose the facility to which she should be transferred. There is no indication that the practitioners in Joplin had any input in that decision. The only reference to Select in the Freeman Medical Center records constitutes an acknowledgment that that was where the plaintiff would go for rehabilitation. On the eve of her discharge, in the discharge summary, Dr. Curtis wrote: "She will need to go to select for rehab and respiratory tx." (AR 162.) This statement is neither a directive that she go to Select nor a conclusion that it was the nearest medically appropriate facility. Instead, it constitutes recognition that it was the facility to which

she was going to be transported and that she would need rehabilitation and respiratory treatment at that facility.

The situation here is entirely different from that in *Brunelle v. Mid-America Associates, Inc.*, No. 16-cv-13446, 2017 WL 3588055, *5 (E.D. Mich. Aug. 21, 2017), on which the plaintiff seeks to rely. In *Brunelle*, the plaintiff suffered from a blood coagulation problem that was causing him to suffer from uncontrolled nose bleeds. He was treated at Marquette General Hospital, where he underwent several procedures and surgery, none of which succeeded in stopping or controlling the bleeding. He was readmitted to Marquette approximately a week after surgery, when the bleeding continued. *Id.* at *1. His treating physician at Marquette, in consultation with a hematologist on staff, determined that the plaintiff needed to be transferred elsewhere for treatment. The doctor contacted the University of Michigan hospital, which agreed to accept the plaintiff.

While the hematology department's records showed that it concluded that the plaintiff needed to be sent elsewhere because "most of the labs . . . would need to be send-out [sic] labs and it would take several days to get the results," the transfer form indicated that the transfer was for the "availability of specialized services, facilities, diagnostic equipment, [and] personnel," and the prehospital care report stated that transport was needed "for clotting factor surgery not available at Marquette General." *Id.* A letter by the plaintiff's treating physician produced shortly after the denial of his initial claim for the cost of air transport opined that the University of Michigan was the "closest facility to handle this coagulation problem" and that transport by air was required, because ground transport would take more than eight hours, and the plaintiff's serious medical condition placed him at great risk of spontaneous bleeding and "increased risk for severe anemia, acute MI, flash pulmonary edema, and even death." *Id.* at *2.

The initial denial was upheld on review based on independent reviewer reports concluding that the University of Michigan was not the nearest appropriate facility, as required by the plan, and that transport was "likely 'primarily for the convenience of the member" and, therefore, not consistent with medical necessity. *Id.* On final review, the defendant upheld the denial based on a conclusion that air transport was not medically necessary, because the nearest facility capable of providing appropriate care was not utilized, and the plaintiff was medically stable at the time of transfer. *Id.* at *3. The district court granted the plaintiff relief, concluding that the defendant's review was not supported by substantial evidence, where the reviewers failed to address the treating physician's statement that the University of Michigan was the nearest appropriate facility to diagnose and treat the plaintiff's rare bleeding disorder and that ground transport would pose serious health risks. The defendant's failure to "adequately consider and explain the conflicting evidence in the record" rendered its decision arbitrary and capricious. *Id.* at *6.

The plaintiff also relies on *Aviation West Charters, LLC v. Health & Welfare Plan*, 425 F. Supp. 3d 1016 (N.D. Ill. 2019). In that case, the plaintiff was in a dirt bike accident near Portland, Oregon, in which he suffered numerous serious injuries, including a traumatic brain injury. After several weeks of treatment at a hospital in Portland, he was still struggling with cognitive functioning, and his treating physician recommended that he undergo inpatient rehabilitation at Craig Hospital in Colorado. The doctor recommended Craig Hospital "because of its strong reputation for treating patients with severe traumatic brain injuries." *Id.* at 1019. Cigna approved treatment at Craig but denied coverage of the cost of air transport from Portland to Craig. The cost was initially denied on the grounds that the service was not medically necessary, and that determination was affirmed on administrative appeal on the basis that, in addition to the plaintiff's failure to obtain prior authorization, Craig Hospital was not the nearest appropriate facility. The

district court held that the plan administrator's review was "substantively flawed" because it failed to address the treating physician's opinions that transfer to Craig was necessary, because that facility provided the "highest level of care" available and had better outcomes than other facilities, and that air transport was required. *Id.* at 1025. The court noted that Cigna was "not obligated to accept" the treating physician's conclusions, but it "was not, however, entitled to simply ignore" them or "dismiss those conclusions *without explanation*." *Id.* (internal quotation marks omitted; emphasis in original).

Both of those cases are distinguishable from this one, in that the plaintiffs' treating physicians actually made affirmative decisions, based on the plaintiff's medical condition, that transfer to a specific facility was required, and each doctor recommended a specific facility that he or she believed was the nearest medically appropriate facility. Neither opinion suggests that the plaintiffs' preferences (or place of residence) figured into the physicians' treating decisions. The plan administrators' reviews were deficient because they failed to address the treating physicians' opinions regarding the necessity of transfer to specific locations that they believed were the nearest medically appropriate facilities. In contrast, in Heisz's case, the treating physician simply acquiesced in Heisz and her family's determination of where she should undergo rehabilitation; he never opined that Select was the nearest medically appropriate facility.

The plaintiff also argues that the plan administrator's decision was substantively flawed because it did not address Dr. B. Klein's opinion. The court finds that Dr. Klein's letter was so devoid of evidentiary support or indicia of reliability that the defendant had no obligation to accord it any weight or, indeed, to consider it. As the defendant points out, Dr. Klein's letter offers no information as to his identity, whether he is actually licensed in any state to practice medicine, where he practices or in what area of specialization, or what qualifications he has to opine on the

rehabilitative treatment of serious spine injuries. Dr. Klein's two letters do not identify the information reviewed in the formation of his opinion, and several assertions therein are inconsistent with the facts. Specifically: (1) Dr. Klein purports to offer an opinion as to the "medical necessity of *emergency air transport* of Carol Heisz" (AR 134, 206 (emphasis added)), but the air transport was not an emergency transport; and (2) contrary to Klein's assertions, the Freeman Medical Center records do not reflect or even remotely suggest that the decision to transport Heisz to Select was the result of an "informed and educated decision" by her "treatment team," including "neurosurgery, pulmonary, internal medicine, psychiatry and social services" (AR 135, 208).

Other courts have found that it is not arbitrary and capricious to deny coverage of medical transport under similar circumstances, where the record supports a conclusion that the transfer was for the claim beneficiary's or her family's convenience, rather than for medical reasons. *See, e.g.*, *Gernes v. Health & Welfare Plan*, 841 F. Supp. 2d 502, 510 (D. Mass. 2012) (finding that the denial of air transport from France to a hospital closer to the plaintiff's home in the United States as not medically necessary was not arbitrary and capricious and noting that the "record shows that [the plaintiff] failed to produce enough evidence in support of her claim that air ambulance transportation was medically necessary under the Plan," despite a letter from the plaintiff's treating physician in France stating that the plaintiff needed "evaluation and rehabilitation" and that the hospital in Boston was "the [closest] most appropriate facility to treat her intricate and complex injuries"); *Estate of Larrimer v. Med. Mut. of Ohio*, No. 2:06-CV-0920, 2009 WL 1473981, at *2, 3 (S.D. Ohio, May 27, 2009) (granting defendant's motion for judgment, affirming the denial of the cost of air transport from California to Ohio, where the plan administrator found that transfer "appears to be at the patients [sic] request" and not medically necessary).

Citing *Brunelle* and *Aviation West*, the plaintiff contends that the defendant had the obligation to identify a nearer facility than Select that could have provided rehabilitation services. The court disagrees. Again, the plaintiff bears the burden of showing that the defendant's decision was arbitrary and capricious. The plaintiff was on notice early in the proceedings that the reason for the denial of her claim was that the hospital in Madison was not the closest medically appropriate facility to the hospital in Joplin. The plaintiff does not actually refute that contention. Instead, she posits, through Dr. Klein, that Select was the *only* appropriate facility, as it was the only one that was close to her home and, therefore, could accommodate her need for her family's support of, and participation in, her care. As set forth above, the defendant had no obligation to take Dr. Klein's opinion into consideration. Even assuming that it did have such an obligation, it was not unreasonable under the language of the Plan for the defendant to conclude that the plaintiff's "psychosocial need" for rehabilitation treatment near her home, which is not addressed in the Freeman Medical Center record, was not a *medical* need.

In sum, the defendant's determination that the transport to Madison, Wisconsin was not medically necessary, as it was "primarily for the convenience of the patient [or the] patient's caregiver(s)" (AR 429), and that it was not to the "nearest medically appropriate facility to treat [her] illness or injury" (AR 438) is supported by substantial evidence in the record and is rational in light of the Plan's provisions. *Johnson*, 703 F. App'x at 401. The defendant is entitled to judgment in its favor.

### B.    The Plaintiff's Motion for Judgment

The plaintiff moves the court for judgment in her favor, arguing that (1) her treating physician at Freeman Medical Center determined that transport to her home in Madison, Wisconsin was necessary for medical and psychosocial reasons; (2) the record shows she received medical treatment during the flight to Wisconsin, thus establishing the necessity of air transport;

(3) the defendant's rationale for denying payment has changed over time; and (4) BCBS denied her claim without considering B. Klein, M.D.'s opinion or proffering a closer alternative that would have met her psychosocial needs.

The plaintiff's arguments in support of her Motion for Judgment are without merit, for the reasons discussed above. In particular, her treating physician at Freeman Medical Center never opined that she needed to be transferred to Madison, Wisconsin; there is no dispute, at this juncture, that she could not have been transported by ground ambulance; the defendant had no obligation to consider the opinion of B. Klein; and it was not unreasonable for BCBS and TSC to conclude that there were other rehabilitation facilities closer to Joplin, Missouri than Select, more than 600 miles away in Madison, Wisconsin. Further, the fact that the rationale for the denial changed over time is not determinative, as the court's focus is on the final decision. *See McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1066 (6th Cir. 2014) ("[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)).

## V.     CONCLUSION

For the reasons set forth herein, the court will grant the defendant's Motion for Judgment (Doc. No. 56) and deny the plaintiffs' Motion for Judgment (Doc. No. 55). An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge